IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | | |
|---|---|---|
| Steve Dawkins, Arthur E. Hall, James M. Wheeler, William S. Bratcher, Billy Ray Caldwell, Jerry R. Higginbotham, Robert James Lee, and Jerry Lee Trotter, | ) ) ) ) ) | C.A. No.:  8:02-2403-27 |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| The Owens Corning Hourly Employees' Retirement Plan, a Portion of the Owens Corning Merged Retirement Plan, and The Owens Corning Severance Plan, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**THIS MATTER COMES BEFORE THE COURT** by way of the parties' cross-motions

for judgment.  Plaintiffs assert entitlement to certain benefits pursuant to E.R.I.S.A. 29 U.S.C. §

1132(a)(1)(B).  The parties entered into a Joint Stipulation agreeing to certain relevant facts.  The

parties also agreed that the court may dispose of the matter based upon cross-motions for judgment.[1]

## PROCEDURAL OVERVIEW

By way of the Joint Stipulation, the parties agreed that the Plaintiffs only seek enhanced

retirement benefits and severance benefits pursuant to E.R.I.S.A. 29 U.S.C. § 1132(a)(1)(B) and

attorneys' fees and costs.  The parties agreed that the Plaintiffs have properly exhausted

administrative remedies available under the plans.  Further, the parties agreed upon the applicability

of the plan documents attached to the Joint Stipulation and provided the court the administrative

---

[1] The Fourth Circuit has recognized that the parties may agree to dispose of E.R.I.S.A. governed benefit claim cases by way of cross-motions for judgment while doing away with the summary judgment standard.  (See *Bynum v. CIGNA Healthcare of NC, Inc.*, 287 F.3d 305, fn14 (4th Cir. 2002).)

1

record.

Further, the parties agreed that the following issues are before the court:

> "1.)    With regard to the Defendant "The Owens Corning Hourly Employees Retirement Plan", did the Defendant plan's administrator abuse its discretion, under the appropriate standard of review, in denying the Plaintiffs enhanced retirement benefits under the plan provision cited above when the building in which the Plaintiffs worked was permanently closed in July of 2000.  More specifically, the issue before the court is whether the Defendant retirement plan erred, under the appropriate standard of review, in determining that the closing of the building in which the Plaintiffs worked until July of 2000 did not constitute the closing of a "facility" under the rules of E.R.I.S.A. plan term construction as established by the Fourth Circuit Court of Appeals and this court.
>
> 2.)    Is the Defendant "The Owens Corning Severance Plan" an E.R.I.S.A. governed employee benefit plan or simply an agreement between the Plaintiffs' prior employer, Owens Corning, and the Plaintiffs' Union?  If the severance plan is an E.R.I.S.A. governed benefit plan, then did the Defendant abuse its discretion in denying Plaintiffs' benefits under that plan?"

Plaintiffs are currently receiving retirement benefits through the Defendant Owens Corning hourly employees' retirement plan.  (hereinafter "the retirement plan")  However, the Plaintiffs believe that they are entitled to enhanced retirement benefits through the retirement plan and benefits through an E.R.I.S.A. governed severance plan.  Plaintiffs have not been paid any severance benefits, although they were paid a "performance bonus".[2]

The Defendants contend that the Plaintiffs are not entitled to any additional retirement or severance benefits.  The court is called upon to determine whether Plaintiffs are entitled to the benefits they seek.

Plaintiffs are a group of former employees of Owens Corning Fiberglass (hereinafter "OCF").  All of the Plaintiffs worked for OCF in Anderson, South Carolina in a building segregated

---

[2] The performance bonus for employees who stay with the company until shutdown  is contained in the June, 1999 agreement between the company and the union.

from other buildings owned and operated by OCF. At various times since the 1980s, the building in which Plaintiffs worked has been referred to as the "Alloy Facility", or the "Alloy Department" among other terms.

While Plaintiffs were employed by OCF they were participants in several employee benefit plans. "Alloy" ceased operation in July of 2000. Plaintiffs filed a claim for the benefits they seek in June of 2000. Subsequently, the Plaintiffs filed their complaint in the matter *sub judice* alleging that OCF failed to act on Plaintiffs' claims, and that further attempts to exhaust remedies were futile. Defendant moved to dismiss Plaintiffs' case asserting that Plaintiffs had failed to exhaust administrative remedies. On October 8, 2003, Judge Terry Wooten, to whom the case was then assigned, remanded the Plaintiffs' claims for consideration on review, thereby rendering moot the issue of whether administrative remedies should be further exhausted. After remand, Defendant's administrator issued its final claim decision denying Plaintiffs' claims.

## RELEVANT TERMS OF THE PLAN

### 1. Retirement Plan

The retirement plan document provides in pertinent part:

> **Special Early Retirement**
> If you retire because of a permanent shutdown of a Company **facility**, your pension benefit is computed according to the normal retirement formula. The calculation uses the rate groups and years of credited service, but formula adjustments used to reduce pensions for early retirement do not apply." (Emphasis added)

The retirement plan document also states:

> "The Investment Review Committee or its designee has full authority to interpret and apply in its sole discretion the Plan provisions."

3

## Severance Pay Provision

The severance pay provision states:

>    Section 2.  In the event such a plant or a seniority **department** or seniority unit is considered by the Company to be permanently closed, the Company will give eligible employees severance pay determined by a severance formula of forty-five (45) hours pay at the employee's regular base rate for each full year of service.  To be eligible, an affected employee must have at least one (1) year of service in the same plant for a permanent plant closing and in the same department for a permanent department closing, and must not have been furloughed for more than twelve (12) consecutive months immediately preceding the permanent plan or departmental closing.
>
>    The highest permanent base rate held by the employee within the twelve (12) months preceding the closing shall be used to determine the amount of severance to be paid. In the case of a permanent seniority department or seniority unit shutdown, if the eligible employee elects not to take the severance pay, they may elect to retain their seniority and forfeit any claim to the severance pay.  Such employees electing to retain seniority will be placed in the plan in accordance with their seniority rights.  In no case will severance be paid to any affected employee for shutdowns other than recognized, permanent plan or seniority department or seniority unit closings as described in this Section.
>
>                             • •"[3]   (Emphasis added)

The severance plan, if it is considered as a separate plan from the retirement plan, has no language that reserves unto any entity or person discretionary authority.  If it is considered as part of the retirement plan, then the discretionary authority clause in the retirement plan applies to the administrator's review of severance benefits.

## The Final Claim Decision

On December 18, 2003, the person designated by OCF to consider Plaintiffs' claims,

---

[3] All of the Plaintiffs meet the criteria for payment of severance benefits.  Plaintiff Dawkins testified in his supplemental affidavit as follows:
>    "2.  I have considered the language of Section 2 of the severance plan and I can state under oath, under penalty of perjury, that I and each and every one of the other plaintiffs meet the criteria for severance benefits as set forth in Section 2.  Each plaintiff has at least one year of service in the same plant and in the same department, which is Alloy, and none of us have been furloughed for more than twelve (12) consecutive months immediately proceeding the closing of Alloy in June of 2000.  Company records will reflect that what I have stated above regarding each of the plaintiffs is true and accurate." (*Bates* pp. 127 and 128)

Richard C. Tober, issued a letter concluding "that the term 'facility' as used in the Plan documents refers to the entire Anderson Plant and not to one of its departments, namely the Alloy Department. Based on this interpretation, there is no entitlement to any additional severance or retirement benefits."  The letter provides:

> Based on my review of the documents and my interviews, I hereby deny your clients' claim for the following reason (s):
>
> (1)  In June of 1999, an Agreement was entered into between Owens Corning and the Union representing the employees in the Alloy Department.  The Union is the sole collective bargaining agent for the employees.  All of the employees affected by the discontinuance of this Department received retirement and severance benefits pursuant to this Agreement.  The Agreement contained language indicating that it addressed "all outstanding issues" related to the Alloy Department employees.
>
> (2)  The employees in the Alloy Department had a period of sixty (60) days in which to file a claim if they were not in agreement with the benefits calculated under the Plan. A timely claim was not submitted by any of the above referenced claimants.
>
> (3)  The employees in the Alloy Department had a period of sixty (60) days in which to file a claim asking for an interpretation of the term "facility closure" as it is used in the Plan documents.  A timely claim was not submitted by any of the above referenced claimants.
>
> (4)  The employees grieved the Union's decision as to the benefits owed to them under the Agreement, and the grievances were ultimately denied by the NLRB.  No appeal of the final grievance decision was filed with any federal court.
>
> (5)  The Union Shop Contracts have clearly and consistently referred to the Alloy Plant as a "Department" and the Alloy Department has its own department number.
>
> (6)  Owens Corning's Plan documents do not treat one department differently than another.  Retirement benefits apply to entire plants and do not, and have not ever, applied to individual departments.
>
> (7)  In June 1999, the term "facility' as used in the Plan documents is defined as a total plant or facility, not a unit or department.  It is my understanding that the "Alloy" business unit at the Anderson, South Carolina plant was never viewed as a "total plant" within the facility, and thus should not be treated as one within the meaning of Owens Corning's Plan documents.
>
> (8)  The fact that the terms "facility", "operation", "plant" and "department", among other words, have been used interchangeably in the past to describe the Alloy Department is not determinative of what the term "facility" means as it is used in the Plan documents.
>
> (9)  I conclude that the term 'facility' as used in the Plan documents refers to the entire Anderson Plant and not to one of its departments, namely the Alloy Department. Based on this interpretation, there is no entitlement to any additional severance or

5

retirement benefits.

## FINDINGS OF FACT

1. Plaintiffs worked in Alloy Operations at the Owens Corning Plant in Anderson, South Carolina. (Second Amended Complaint, ¶ 5)

2. Plaintiffs were members of the Glass, Molders, Pottery, Plastics and Allied Workers of the United States and Canada, Local Union 15. (hereinafter "Union") (Administrative Record, 000725,000726, 000764-000766)

3. Alloy Operations is one of the departments listed in and covered by the 1996-2001 Union Shop Contract. (Administrative Record, 000764-000765)

4. The Union is the exclusive bargaining representative for employees working in Alloy Operations, including all of the Plaintiffs. (Administrative Record, .02 -.04, 000018, 000725, 000766: "The company recognizes the Union as the sole collective bargaining agent for all employees described in Article II, Section 1 herein." *Id.* at 000726.

5. The Union Shop Contract permits changes to its terms by mutual agreement of the Company and the Union.  (Administrative Record, 000726)

6. The Union Shop Contract applies to "Owens Corning Corporation's Plant Facility at Anderson, South Carolina … and the Glass Molders, Pottery, Plastics and Allied Workers of the United States and Canada and Local Union 15 thereof…."  (Administrative Record, 000725, ¶ 1)

7. The Union Shop Contract provides in Article 23 thereof: "The Company's present Pension and Retiree Health Care Plan is a part of this Contract.  This plan shall remain in effect during the life of this Contract.  Changes in such plan . . . must be mutually agreed to by the

Union and the Company.  The Company and Union will meet prior to December 31, 1999,

for purposes of negotiating a new plan."

8.  The Union Shop Contract contains a severance benefit as follows:

> 393.  Section 1.  The Company shall notify the International Union representative and the Local Union 15 Committee ninety (90) calendar days in advance or as soon as possible thereafter of the date of the permanent closing of the Anderson plant.  If less than ninety (90) calendar days notice is given, the employees working the ninety (90) calendar day period prior to the actual closing shall be paid for each scheduled work day less than the ninety (90) calendar days that the notice is given.  Such pay will be at the number of scheduled hours for that employee's normal workday at his current base rate.394.  Section 2.  In the event the plant is considered by the company to be permanently closed it will apply a severance formula of forty (40) hours pay at the employee's regular base rate for each full year of service up to thirty (30) years of service.  Eligibility will be determined by employees having at least one (1) year service and not having been furloughed for more than twelve (12) consecutive months immediately preceding the plant closing.  The highest permanent base rate held by the employee within the twelve (12) months preceding the closing shall be used to determine the severance pay.395.  Section 3.  Employees working at the time of the ninety (90) calendar day notice will be provided six (6) months of Health Care coverage (exclusively of weekly Sickness and Accident benefits and Life Insurance), or payment to an HMO at the existing Company payments.  Such coverage will start at the time of the employee's involuntary furlough or termination.  Should an employee become covered under another employer's plan, the Company's plan will become the secondary carrier.396.  Section 4.  No employee who leaves the Company prior to the closing without Company consent is eligible for severance.  All payments are subject to normal taxes.  Employees will be eligible for these benefits only after the employee has signed and returned an individual waiver and release.  This waiver and release will be similar to those signed by employees at previously closed Company facilities.

9.  On June 17, 1999, the Union and the Company entered into an Agreement on

Discontinuance of Anderson Alloy Operations.  (Administrative Record, 794).  The

agreement provides that it is in "full settlement of all issues raised or which could

have been raised in connection with the discontinuance of manufacturing operations

and shutdown of the Anderson Alloy operation." It provides for the payment of a

$25,000 *performance bonus* to every eligible employee who stays with the company

through the shutdown. It also addresses early retirement of employees who would

reach age 55 by year-end and those who would reach 55 within 6 months of the

shutdown.

10. The Union and the Company entered into an agreement on January 1, 2000 (Admin.

Record, 000838-839) which provides that "the parties have agreed to the provisions

of the Pension Plan . . . to be effective January 1, 2000. . ." The Agreement further

provides that it "is the sole agreement providing for the aforementioned benefits and

supersedes the undersigned parties' Collective Bargaining Agreements." The

Agreement by its terms applies to Local #15 in Anderson. The new provision at

issue in the case at bar which provides for enhanced retirement benefits where a

facility is closed is contained in the new January 1, 2000 Pension Plan document.

11. In January of 2000, the Anderson, South Carolina Owens Corning plant officials

made the official announcement that the Alloy operations would be discontinued

and Alloy employees would begin to be permanently laid off as of March 31, 2000.

(Administrative Record, 000041)

12. The official notification letter stated, ". . . Owens Corning, Anderson, South

Carolina plant, plans to permanently discontinue operations at its Alloy facility. . .

This is not a complete plant closing of the Anderson facility." *Id.*

13. Pertinent documents contain numerous references to Alloy as a "department". For

instance, Alloy is listed as a "department" in the 1995-2001 Union Shop Contract

(Administrative Record, 000766); in the same Union Shop Contract, seniority at the plant is determined in terms of "departments" (Administrative Record, 000727-000729); job bidding is by "department" (Administrative Record, 000738) and grievances begin at the "departmental" level (Administrative Record, 000742).

14. Alloy is given a specific "department" number in the Union Shop Contract: department number 403.  (Administrative Record, 000766)

15. Numerous letters, newsletters, and other documents generated by the company over the last twenty years refer to Alloy as a *facility*.  (*See* attachments to Steve Dawkins Affidavit.)

16. A document entitled "Severance Pay" and a document entitled "Plant/Seniority Department/Seniority Unit Closing" were attached to the January 1, 2000 Agreement and are contained in the Administrative Record at 000845 and 000854-55.

17. The deposition of Jim Roser, Manager of Human Resources for Owens Corning, indicates that the document entitled "Severance Pay" appeared to be a draft from the 99/2000 pension negotiations but that the document entitled "Plant/Seniority Department/Seniority Unit Closing" appears to be a final document.

18.  The defendant's Memorandum states: "Plaintiffs contend that the pension plan that was amended effective January 1, 2000 applies to the Plaintiffs because they remained employed *until June of 2000.*  It is undisputed that this plan was changed to grant severance benefits to employees when there is a department closure as well as a facility closure.  However, Defendant contends that the June 19, 1999

9

Agreement on the Discontinuance of Alloy Operations resolved all issues regarding severance benefits, that the Union acknowledged the same and that this Discontinuance Agreement is not a plan, but rather a collectively bargained agreement." (Page 16)

19.  Plaintiffs, as members of Local 15, were dissatisfied with the Union's actions regarding the closure of Anderson Alloy operations and grieved the Union's actions pursuant to Article 8 of the Union Shop Contract.  (Administrative Record, grievances: 000778-000788)

20. Article 8 of the Union Shop Contract lists six steps in the grievance process. (Administrative Record, 000742-000743)

21. On August 31, 2001, the Union forwarded the Plaintiffs' grievances concerning the Alloy closure to the Director of Labor Relations for Owens Corning Corporation. (Administrative Record, 000789 – 000790)

22. The Union as authorized representative of the employees used the term "department" to describe Alloy during the initial stages of the grievance process. (Administrative Record, 000793)

23. The Local Union withdrew the grievances after Step Five.  (Administrative Record, 000793; *see also* 000789-000793)

24. Step Six of the grievance states, "If the grievance is not settled pursuant to the procedure set forth in Step #5 and either party desires to submit the grievance to arbitration, it shall within ten (10) days after the termination of Step #5 of the grievance procedure so notify the Vice President….in writing setting forth the

10

matter in dispute which may then be submitted to arbitration." *Id.*

25. When the Union withdrew the grievances after Step 5 of the process on October 16, 2001, it "maintain[ed] the position on the Alloy Department concerning pension benefit calculations." (Administrative Record, 000791-000793)

26. Plaintiffs did not file suit against the Union for misrepresentation or pursue arbitration under Step Six of the collective bargaining agreement when the Union failed to press the issue of Plaintiffs' alleged entitlement to increased benefits.

27. Former Owens Corning Human Resource Director Jim Roser testified in his deposition that the Union understood the Alloy closure was a department closure and not a closure of the entire Anderson facility. (Administrative Record, 000207 – 000211; 000215 – 000216)

> The local leadership of the union understood what... the terms meant. We had open discussions across the table with pension negotiations about what the word meant or didn't mean. Every word can't be defined and clarified in the document. But, no, there is no confusion about that. ... I would say in terms of the longevity of both gentlemen [Plaintiffs] in terms of being at that plant and having seen numerous seniority departments abolished...under that same contract claim with that same pension language, they [the Plaintiffs] knew what the issue was. (Administrative Record, 000219-000220)

28. Plaintiffs have each received $25,000.00 performance bonuses pursuant to the June 17, 1999 Discontinuance Agreement. (Administrative Record 000794-000796; Deposition testimony, 000211 and employee earnings records, 000353-000430)

29. The Investment Review Committee is the Named Fiduciary of the Plan. (Administrative Record, 000017) The Investment Review Committee's designee is Richard C. Tober.

11

30. Richard C. Tober, as Plan Administrator designee, reviewed all of the documents presented by the Plaintiffs, the Plan, the June 17, 1999 Agreement on Discontinuance of Anderson Alloy Operations, documents pertaining to the 2000 collective bargaining agreement negotiations and the 2001 Union Shop Contract, the Owens Corning Merged Retirement Plan, grievance documents and arbitration documents relating to the similar case concerning the same issue in Owens Corning Newark, Ohio plant.  (Affidavit of Tober, Administrative Record, .05-.06)

31. Additionally, Mr. Tober had previously discussed the benefits due to Plaintiffs with Union negotiators during Union negotiations, as well as with representatives of the Union Negotiation Committee and Owens Corning HR personnel.  *Id.*

32. Mr. Tober determined that the term "facility" applies to entire plants, not just to individual departments such as Alloy.  (Administrative Record, .03)

33. The Plan at issue, the Owens Corning Hourly Employees' Retirement Plan, is one of 11 Plans that form the Merged Retirement Plan. (Administrative Record, 000440-000656) The Plan belongs to Owens Corning and the participants are employees of Owens Corning, not of the Alloy Department; no individual "departments" have their own ERISA plans - only facilities have plans.  (Administrative Record, 000492)

34. In determining the definition of the term "facility" as used in the plan documents, Mr. Tober also considered the results of a Owens Corning arbitration held in November of 2001, in Newark, Ohio regarding this same issue raised by the same Glass, Molders, Pottery, Plastics and Allied Workers' Union, though it was a

different Local.  (Administrative Record, 000813 – 000834)

35. Local Union 244 in Ohio also argued during the arbitration that when the Alloy operations at the Newark Ohio plant shut down that there had been a "permanent shutdown of a company facility" entitling them to enhanced retirement benefits pursuant to the Plan.  (Administrative Record, 000821 to 000822)

36. The arbitrator in the New Jersey case noted that language extending the increased retirement benefits to the closure of a seniority department or seniority unit was discussed, but noted that the discussed language still provided for early retirement at a *reduced rate.  Id.*

37. Arbitration testimony by Richard H. Jones, Director of Industrial Relations and chief spokesman for Owens Corning during the 1999 pension negotiations, established that special early retirement only applied to an entire facility, and that the parties reached agreement on that language well before the end of negotiations. (Administrative Record, 000822)

38. The arbitrator noted that the Union acknowledged at the arbitration hearing that the term "facility" was not a "department."  (Administrative Record, 000828)

39. The arbitrator held that the Union had not proven by a preponderance of evidence that the parties agreed to modify the meaning of the word "facility." (Administrative Record, 000831)

40. The arbitrator also found that the Union's position was contradictory, as the Union argued the term "facility" included the terms seniority department or seniority unit in one paragraph and then argued in another paragraph of the Union Shop Contract

that the terms "facility", "seniority department" and "seniority unit" were separate

terms.  As the arbitrator stated, "If a 'facility' was an all inclusive concept, it would

seem entirely unnecessary to use the words 'department' and 'unit' in the next

section." *Id.*

41. The arbitrator denied the Union's grievance on the basis that there was a written

distinction between the term "facility" and "department."  *Id.*

42. Mr. Tober testified at this arbitration hearing in November of 2001.

43. Mr. Tober testified at the arbitration that he had been Plan Administrator since 1980

and that departmental closings had never been granted enhanced retirement benefits

in the past. (Administrative Record, Arbitration Award: 000819)

44. The arbitrator's award denying the Union's grievance and distinguishing between

the terms "department" and "facility" was issued in December of 2001, six months

before Plaintiffs filed this litigation and two months after the Local Union 15 in

Anderson withdrew the Plaintiffs' grievances.  (Administrative Record, 000793)

45. Mr. Tober, as Plan Administrator, issued a denial letter to Plaintiffs' claim for

increased retirement and severance benefits on the basis that "the term 'facility' as

used in the Plan documents is defined as a total plant or facility - not a unit or

department" and that the closure of Alloy operations did not entitle Plaintiffs to

additional pension or any severance benefits as the June 17, 1999 Discontinuance

Agreement settled all issues pertaining to the closure of the Alloy Operations.

(Administrative Record, .02-.04)

## CONCLUSIONS OF LAW

**1.  Did Defendant Retirement Plan err, under the appropriate standard of review, in determining that the closing of the building in which the Plaintiffs worked until the summer of 2000 did not constitute the closing of a "facility"?**

### A.  Scope of Review

The Court must first determine the applicable standard of review to the claim for enhanced retirement benefits.

The Plan at issue contains language conferring in the Investment Review Committee (the "IRC") or its designee full authority to interpret in its sole discretion the Plan provisions and designates the IRC as the named fiduciary.  This language, therefore, qualifies under *Firestone Tire and Rubber Co. v. Bunch*, 489 U.S. 101 (1989), as conferring to the IRC the discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  That being the case, the appropriate standard of review for interpretations of the Plan is the abuse of discretion standard.  *Firestone,* 489 U.S. at 111.  The Fourth Circuit has reiterated the law concerning the standard of review:

> In cases in which a court reviews an ERISA plan administrator's decision to deny benefits, a reviewing court must initially decide *de novo* whether the plan's language grants the administrator discretion to determine the claimant's eligibility for benefits, and if so, whether the administrator acted within the scope of that discretion.  *See Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 89 (4th Cir. 1996).  If the reviewing court determines that the language of the plan confers discretion on the administrator to determine eligibility or to construe terms of the plan, *then a court reviews the decision to deny benefits for abuse of discretion*.

*Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522 (4th Cir. 2000)(*citing Firestone*)(*emphasis added*)

Further,

> [t]his deferential standard of review requires that a reviewing court not disturb an administrator's decision if it is reasonable, even if this Court would have reached a

different conclusion.

*Id.*

The Fourth Circuit further enunciated the standards applicable to the scope of review of courts in ERISA cases in *Colucci v. AGFA Corp. Severance Pay Plan*, 431 F.3d 170 (4th Cir. 2005). In *Colucci*, the Court explained:

> When a plan by its terms confers discretion on the plan's administrator to interpret its provisions and the administrator acts reasonably within the scope of that discretion, courts defer to the administrator's interpretation. . . In those circumstances, a court will not disturb an administrator's decision as long as it is reasonable. . . This is because the plan, in conferring discretion on a trustee with respect to a specific matter, deliberately yields to the trustee's judgment on that matter, as long as it is reasonable. The plan thus recognizes that on such a matter, various reasonable decisions and interpretations could be made, and it accepts, as a contractual term of the plan, the range of decisions that a trustee could reasonably make. . .
>
> Yet when the plan's terms are ambiguous in the sense that its language gives rise to at least two different but reasonable interpretations and when the plan confers discretion on the administrator to interpret the plan and resolve ambiguities, a court defers to the administrator's interpretation by reviewing it only for abuse of discretion.

*Id.*, 431 F.3d at 176.

Plaintiff argues that the abuse of discretion standard should be modified due to the conflict of interest by the Plan Administrator, Richard C. Tober, an employee of Owens Corning.[4] The Court notes that Tober was not only an employee but also testified on the company's behalf at arbitration proceedings regarding another plant. Therefore, arguably he may have been aligned with the company leadership. However, the plaintiff does not direct the court to sufficient evidence that the administrator

---

[4] A fiduciary's conflict of interest "may operate to reduce the deference given to a discretionary decision of that fiduciary. . . A court, presented with a fiduciary's conflict of interest, may lessen the deference given to the fiduciary's discretionary decision to the extent necessary to neutralize any untoward influence resulting from that conflict." *Colucci*, 431 F.3d at 179, *citing Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335, 340-41 (4th Cir. 2000).

relied on biased information provided by the sponsor or was exposed to unfair evidence as a result of his close alignment with company leaders.  Therefore, the Court does not find that he operated under a conflict of interest and the abuse of discretion standard is not modified.  However, even if he did operate under a conflict of interest, the Court finds that the administrator still did not abuse his discretion in denying the enhanced retirement benefits.

**B.  Review of Decision of Administrator as to Enhanced Retirement Benefits under Abuse of Discretion Standard**

The following factors are relevant to a determination of the reasonableness of an administrator's decision: "(1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest in may have." *Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000).

Applying a deferential standard of review, there is substantial evidence in the record that the term "facility" in the pertinent provision of the Pension Plan referred to the Anderson plant and not a department of that plant. Therefore, the Court finds that the Plan Administrator did not abuse his discretion in denying plaintiffs' claim for increased retirement benefits.

As the Plan Administrator stated in the denial letter, merely because several words are used interchangeably to describe the Alloy Operations such as "plant", "facility", "shop", "department"

and "operations", the use of one of those terms, particularly the use of the term "facility", does not serve to automatically grant Plaintiffs rights that neither the Union nor the Employer ever intended. The Plaintiffs' interpretation of the term "facility" is not what is important in this case - it is how the term is used in the plan documents. In the plan documents, there is an abundance of evidence to support the Plan Administrator's conclusion that the term "facility", as used in the plan documents, applies to the entire Anderson plant and not to any one department, such as Alloy. The applicable 1996 Union Shop Contract clearly describes Alloy as one of several departments located at the Owens Corning plant facility in Anderson, S.C.

Second, the Plan Administrator's decision as to whether the Plaintiffs are entitled to increased retirement benefits was based on facts and documents known to him at the time he made his decision. *See Berry v. Ciba-Geigy*, 761 F.2d 1003, 1007 (4th Cir. 1985). At the time the pension decision was made, the Plan Administrator's designee was well acquainted with the issue, having testified at an arbitration in Newark, Ohio, sat in on Union negotiations and reviewed benefit decisions regarding previous department closures for many years.[5]

Based on the information available to the Plan Administrator's designee, the decision to deny enhanced retirement benefits is reasonable. *Bynum v. CIGNA Healthcare of North Carolina, Inc.,* 287 F.3d 305, 312 (4th Cir. 2002) The Plan Administrator's decision is supported by substantial evidence and results from "a deliberate, principled reasoning process" as required in *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997).

---

[5] The Administrator also relied upon the June, 1999 Agreement on Discontinuance of Anderson Alloy Operations. The effect of the agreement is a legal issue which is reviewed *de novo*. *Johannssen v. District No. 1-Pacific Coast Dist., MEBA*, 292 F.3d 159, 169 (4th Cir. 2002). Due to the fact the January 1, 2000 agreement between the union and the company applied to the Anderson Local and specifically provided that it "supersedes the undersigned parties' Collective Bargaining Agreements," the Court does not believe the June of 1999 Agreement barred the plaintiffs' claims to enhanced retirement benefits. However, this was only one of the administrator's reasons for denying benefits and still shows his good faith attempts to review the matter.

18

The holding in *Bynum v. CIGNA Healthcare of North Carolina, Inc.*, 287 F.3d 305, 313 (2002) is distinguishable from the facts in this case because in *Bynum*, the fiduciary failed to define an ambiguous (undefined) term prior to the denial of a claim.

The Court in *Bynum* found:

> Throughout its administrative handling of [the plaintiff's daughter's] claim, CIGNA failed to define the relevant terms "cosmetic," "cosmetic services," or "cosmetic procedures." Instead, it simply advised Ms. Bynum that Katrina's Claim had been denied because the DOC [Dynamic Orthotic Cranioplasty] Procedure was of a "cosmetic nature." In addition, the record before CIGNA's Committee lacked any reference to CIGNA's definition of "cosmetic," and CIGNA failed to document why the DOC Procedure, as applied to Katrina's skull deformity, constituted an excluded cosmetic procedure. Because there is no evidence that CIGNA sought to define "cosmetic" before being sued by Ms. Bynum, or that CIGNA applied a reasonable definition of the term to Katrina's claim, the court did not err in declining to defer to CIGNA's after-the-fact definition of "cosmetic."

*Bynum* at 313; *See also, Sheppard & Enoch Pratt Hospital, Inc. v. Travelers Insurance Co.*, 32 F.3d 120, 125 (4th Cir. 1994).

In the case at hand, the retirees applied for benefits under the Defendant Plan through their attorney on October 13, 2003 pursuant to a Court Order. Prior to that time, Mr. Tober had previously testified as to the definition of the term "facility" in the November 2001 Newark, Ohio arbitration hearing and had previously defined the term facility "as a total plant or facility, not a unit or department." Mr. Tober set forth in detail his rationale for arriving at his conclusion that the term "facility," as used in the Plan, encompassed more than the Alloy unit in the denial letter.

As there was a closure of a department and not a facility as that term is used in the plan documents, Plaintiffs are not entitled to enhanced retirement benefits. Defendant's coverage decision denying additional benefits is reasonable. *Bynum v. CIGNA Healthcare of North Carolina, Inc.,* 287 F.3d 305, 312 (4th Cir. 2002)  The Plan Administrator's decision is supported by

19

substantial evidence and results from "a deliberate, principled reasoning process".

**2. Is the "Owens Corning Severance Plan" an E.R.I.S.A. governed employee benefit plan or simply an agreement between the company and the union?  If the severance plan is an ERISA governed benefit plan, then did the defendant abuse its discretion in denying benefits under the plan?**

The record contains various pieces of controverted evidence and documents regarding the "severance plan".  However, it is not necessary to analyze the complex and tortured history of those documents, as the defendant has agreed (as previously referenced in Finding of Fact #18), that the retirement plan was changed effective January 1, 2000[6] to grant severance benefits to employees when there is a department closure.  In taking the position that no severance benefits should be paid, the defendant relies on its argument that the June 17, 1999 agreement bars the plaintiff's claim for severance benefits, since it states that it is in "full settlement of all issues raised or which could have been raised in connection with the discontinuance of manufacturing operations and shutdown of the Anderson Alloy operations."

However, the 1999 document makes no reference whatsoever to the severance pay program.  The words "severance" or "severance pay"are nowhere mentioned in the document.   Instead, the document deals with negotiations between OCF and the Union regarding a "performance bonus of $25,000.00" which would be paid <u>only</u> to those employees who met specific conditions set forth in the "performance bonus" document.  Apparently, the "performance bonus" program was simply another benefit program that was available to persons who were eligible.  There are no issues before the court regarding claims under the performance bonus program.  The eligibility provisions for the severance pay and the performance bonus are different.  A person may draw severance pay, but not the performance bonus or *vice versa*.  Some persons may draw both the performance bonus and

---

[6] Plaintiffs worked for the company until June of 2000.

20

severance pay. The consideration for each benefit and the eligibility requirements are completely separate. A person who worked "through the required period" as set forth in the June 17, 1999 document would be entitled to the $25,000.00 "performance bonus". The required period was "through the official shutdown date".[7] Therefore, any eligible individual who worked in Alloy on June 17, 1999 and continued there through its' shutdown in July of 2000 would be entitled to the $25,000.00 performance bonus. The obvious intent of the $25,000.00 performance bonus was to keep employees in Alloy until it finally shutdown. Obviously, employees in Alloy who knew they were going to lose their jobs in June of 2000 would begin looking for other jobs. The obvious intent of a performance bonus was to keep employees working in Alloy through the shutdown date and to give employees financial incentive not to go out and find another job right away.

An individual employed on June 17, 1999 and who worked through the Alloy shutdown in July of 2000 and who would have been eligible for the $25,000.00 performance bonus may not have been entitled to any significant severance benefits. If a person was employed in Alloy on June 17, 1999, but had only gone to work on June 1, 1999 then upon closing of Alloy in July of 2000 that person would only have one year of service for the purpose of the severance plan. Under the severance plan, a person with "one year of service in the same plant" would be entitled to "45 hours pay". Clearly, the severance plan was intended to reward individuals who had been with OCF for a long period of time. A person who had only been with OCF from June 1, 1999 until the closing would get a $25,000.00 performance bonus for staying on and not taking another job, but only would get one week pay under the severance plan. Conversely, an individual who had 30-years

---

[7] The performance bonus document states: "Each employee working in Alloy as of the date of this agreement who continues working in Alloy through the official shutdown date, shall be eligible for the performance bonus subject to each of the following conditions as determined by the company."

service with OCF and who stayed on in Alloy to its shutdown would be rewarded for <u>both</u> the many years of service and staying on to the end.  Finally, a person with 30-years of service who did not work in Alloy to shutdown may receive severance benefits, but not the $25,000.00 performance bonus.

The court finds that the intent of the "performance bonus" and the "severance" plans was completely different.  As noted above, the performance bonus plan states nothing whatsoever about the severance pay plan.  The two documents are completely segregated and independent from one another.  Therefore, the court finds the performance bonus plan document is not a release of Plaintiffs' rights under the severance pay plan.

As further support for this finding, the Court notes that the January 1, 2000 Agreement between the union and the company states that it is the "sole agreement providing for the aforementioned benefits and supersedes the parties' Collective Bargaining Agreements."  The agreement clearly covered the retirement plan, which included the severance pay benefit, as agreed by the defendant in its memorandum (page 16)

Plaintiff contends that a *de novo* standard of review applies.  The Court disagrees and finds that an abuse of discretion standard applies, since the severance plan is a part of the retirement plan which by its terms provides for discretion by the administrator.  However, under an abuse of discretion standard, the administrator clearly erred and abused his discretion in finding the severance plan did not apply.  "Yet, even as an ERISA plan confers discretion on its administrator to interpret the plan, the administrator is not free to alter the terms of the plan or to construe unambiguous terms other than as written."  *Colucci*, 431 F3d at 176.  The severance plan applies by its terms to a department closing, as conceded by the defendant.  In addition, the plan administrator

22

erroneously relied on the 1999 performance bonus agreement in denying severance benefits.

The Court finds that the severance pay provision of the plan is contained at Bates 262

(Exhibit 2A of Roser Deposition).

In light of the Court's ruling that the severance plan was part of the pension plan, it is not

necessary to discuss the parties' remaining arguments as to whether the severance plan was a

separate ERISA plan.  However, as an alternate basis for the Court's award of severance benefits,

the Court finds that the severance plan meets the requirements of a severance plan, standing alone.[8]

---

[8] The criteria for determining whether an E.R.I.S.A. plan exists are set forth in *Custer v. Pan American Life Insurance Company*, 12 F.3d 410 (4th Cir. 1993). "With few exceptions not relevant here, ERISA applies to all employee benefit plans that are established or maintained by an employer "engaged in commerce or in any industry or activity affecting commerce," an employee organization, or both.  29 U.S.C. § 1003(a).  While a plan may address welfare benefits or pension plans, an employee welfare benefit plan is defined as:  any plan, fund, or program which was heretofore or is here-after established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits . . . .29 U.S.C. § 1002(1).

However, the purpose of every insurance policy does not automatically establish a welfare benefit plan under ERISA.  The Department of Labor has issued regulations entirely by the employees, the employer is not establishing a plan.  See 29 C.F.R. § 2510.3-1(j).n2  There must be some payment and manifestation of intent by the employer or employee organization to provide a benefit to the employees or the employees' beneficiaries of the type described in 29 U.S.C. § 1002(1).  The existence of a plan may be determined from the surrounding circumstances to the extent that a "reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits." *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982) (en banc).  Thus, for ERISA to apply, there must be (1) a plan, fund or program, (2) established or maintained, (3) by an employer, employee organization or both, (4) for the purpose of providing a benefit, (5) to employees or their beneficiaries.  See *Donovan*, 688 F.2d at 1371." *Custer*, 12 F.3d 410, 417.

By employing the analysis mandated by *Custer* above, it is apparent that the severance plan is an E.R.I.S.A. benefit plan.  For E.R.I.S.A. to apply, there must be a fund, "plan or program".  The relevant document is captioned "Severance Pay" and states "In the event such a plant or a department is considered by the company to be permanently closed, the company will give eligible employees severance pay determined by a severance formula. . . ."  It is clear that there was a "plan or program" established or maintained by OCF" (i.e., the company) for certain of its' employees.  It is also clear that the purpose of the severance pay "plan or program" was "for the purpose of providing a benefit" (i.e., severance pay) to "eligible employees".  Finally, it is also quite clear that the method by which benefits

23

The Court accordingly awards the plaintiff severance benefits under the pension plan effective January 1, 2000, pursuant to 29 U.S.C. § 1132(a)(1)(B).  As the plaintiff has prevailed on the severance pay claim, the Court will entertain an appropriate request for attorney's fees and costs under the statute.

**IT IS SO ORDERED.**

                                             s/ R. Bryan Harwell
                                            R. Bryan Harwell
                                            United States District Judge

September 30, 2007
Florence, South Carolina

---

will be calculated and paid is ascertainable.  The severance plan document states that there is a "severance formula of 45-hours pay at the employee's regular base rate for each full year of service. To be eligible, an affected employee must have at least one year of service in the same plant for a permanent plant closing and in the same department for a permanent department closing, and must not have been furloughed for more than twelve (12) consecutive months immediately preceding the permanent plan or departmental closing."

Based upon *Custer* all five factors which the Fourth Circuit has dictated should be considered do apply.  However, the analysis is not concluded.  In *Custer*, the court referenced the "safe harbor" provision of E.R.I.S.A.  Even if a plan is otherwise established, E.R.I.S.A. provides that the plan will not be subject to E.R.I.S.A. if the plan falls within the "safe harbor" provision.  The "safe harbor" factors are "(1) no contributions made by the employer, (2) participation in the program is completely voluntary for employees, (3) the sole function of the employer or employee organization with regard to the program is to "permit the insurer to publicize the program, (4) the employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program." (*Custer*, 12 F.3d 410, 417, fn2.)  Not one of the safe harbor provisions apply to the severance plan before this court.  First, all benefits paid under the plan are paid by OCF.  Second, there is no provision in the severance pay plan as to participation being "completely voluntary".  Instead, the plan applies to all "eligible employees".  Finally, there is no "insurer" of the plan.  Accordingly, the court concludes that the severance pay program is an E.R.I.S.A. plan pursuant to *Custer*.